RUBIN v. GENERAL HOSPITAL CORP Good morning, Your Honors. May it please the Court. This is a case to correct inventorship under 35 U.S.C. 256, premised on the misappropriation of confidential mutation information. Drs. Rubin and Anderson made a discovery of two mutations causative of familial dysautonomia. This is outlined in our brief. That information was illicitly transferred by a third party to MGH, despite the explicit instruction that it not be transferred to MGH. MGH then utilized this information and claimed it, and the patents ensued. It is this fact that colors the entire case and drives the entire case. Once MGH had our confidential information, a connection between the parties sufficient to invoke Section 256 was present. Once MGH had our confidential information, the parties were no longer independent of each other, as the District Court stated. And once MGH had our confidential information, the District Court's insistence on collaboration as a prerequisite to be named as a sole or a joint inventor falls apart. There are two counts here, a request to be substituted as sole inventors for the present inventors on the patent, and also to be added as co-inventors, two separate counts. What evidence is there that the defendants ever saw the actual work that your clients did? I suppose it's a permissible inference that they saw an abstract, but what competent evidence is there that they ever saw the actual science? There's admissions on the record, Your Honor, that Dr. Grisella received and understood the abstract and understood precisely what it taught. There's also evidence that denies that it sufficiently taught what we believe it did. So there's a conflict, but that creates a genuine issue of material fact. The abstract is enough that the defendants, together with what they already knew, the abstract was enough? Yes, Your Honor, the abstract precisely disclosed one of the mutations explicitly, especially to someone who's of the ilk that Dr. Grisella is, made very, very clear on the major mutation exactly what it is. As to the minor mutation, there's enough information in the abstract that the skilled artisan could readily discern the minor mutation and its location. Beyond the fact about the abstract being admittedly received, reviewed, and understood is the fact that Dr. Grisella had conversations with the editor about the full manuscript that was provided to the editor that, while we don't know since the testimony hasn't been tested yet, we believe provided further evidence that solidified the understanding, the recognition that MGH was lacking at the time that they received the abstract. The abstract was the linchpin here. The abstract was exactly what they needed to understand where their work would culminate, and the unfortunate fact for MGH was that we identified it first. What evidence is there that the defendants knew that they weren't supposed to see the abstract? The editor of the journal was informed explicitly by… I know that he, there's certainly evidence in the record that your clients told the editor not to show it to the defendants. There's certainly at least a tribalistic fact about that, but what evidence is there that the defendants ever saw or ever knew that they weren't supposed to have the information in the first place? Well, Dr. Grisella, upon reading it, recognized that this was information from a competitive group in precisely the same area that he was working in and attempted to turn it back. The whole premise of that was so that he was being asked to review the full manuscript, and he declined at the time. He did the right thing, didn't he? I mean, he saw that this was stuff that he probably shouldn't see and acted in response to that. I'm still trying to understand where the wrongdoing is on the part of the defendants. Right. Well, actually, I respectfully disagree with that. He received the abstract, understood exactly what it taught, and then there were further discussions about the manuscript that occurred. So if you are taking the position that I ought not review this and I ought not have this in my possession, why ask the further questions? Why inquire further about the manuscript and what his competitors were doing? That was completely wrong. So in response, there's evidence in the record. It's kind of like a lawyer getting a disclosure of foolish information and not being able to suppress his or her curiosity. Well, it's worse than that. It's actually worse than that because the curiosity led to apparently a flurry of scientific activity resulting in the inclusion of this information in the patents. The applications that got filed that eventuated in the patents ensued. Well, now, I had understood your position, but correct me if I'm wrong in this respect, to be that what really wasn't particularly relevant to your inventorship claim, whether or not this was wrongfully done, as long as the MGH folks did get exposed to that information. Is that correct? That was sufficient, Your Honor. Yes, that was sufficient. So if this had been sent anonymously through the mail and they opened it up and said, oops, this is something we shouldn't be looking at and closed it up, but they had had time to notice the particular mutation in the letter that was sent to them anonymously, that would be enough? Not for the fact that there were further communications about the information. In your hypothetical, if it would just return to sender. But I looked at it and I saw that piece of information, which at least according to your theory of the case is the key piece of information, that that would be enough to provoke not an interference, exactly not an interference, but an inventorship dispute. Yes, Your Honor, it would. It would because unfortunately it's undeniable what it discloses. It's very clear. It's a short abstract. It has the relevant information in it. If the person in your position had just published a paper and the paper contained this information and the MGH doctors looked at it, that would also put them in a position to be co-inventors? Not necessarily, because we had the information and attempted to publish it in science well before the episode of the transfer occurred. I understand, but I'm trying to see where your theory leads. If you say that conveying the information is enough to make you co-inventors, or even to entitle you to a 256 action to make you sole inventors, then it would seem to me that that would apply to just publishing something, announcing it in the newspaper or in a journal. Would it not? I don't think so. I think a public disclosure is distinct. I think that here there was no available, it was confidential information at the time. It was being conveyed through an intermediary for the purposes of its publication in a respective journal. I'm not sure. I thought you were saying that your theory was we had it and they got it, therefore we have an inventorship clause in action. That's correct. We had it. That would apply to the journal as well. Were it not for the fact that the information was confidential, I suppose, yes, I suppose you're right. Because it's hard to understand. The district court suggested that the appropriate steps to have taken were through the patent interference procedure, and I gather that that has not been put into the works concurrently with this action? Correct, Your Honor. In fact, it's difficult to swallow that the district court would try to dictate what type of remedy we believe we're entitled to. Certainly in the context of a 256 action, there is a much broader scope of discovery that's permitted, for example. And then there's also the question of whether joint inventorship as a remedy ultimately, as an outcome of an interference, is something that could be reconciled on these specific facts. But here the defendants say that they had already found the same mutations, and as a question of true or false, we don't know, I gather, because your position was because of the transgression or whatever of the journal editor, they received your information, were spurred into action. As I recall, the provisional application was filed only two weeks later, and with all of the background unknowns in terms of what might have been proceeding at MGH as well, all of which I would think would have been brought out in an interference through the standard interference processes. So to be sure that I understand your position, it is never mind, because they received your information and on its face acted on it, that's enough to create some sort of relationship which requires some sort of equitable remedy. That's correct, Your Honor. I think that crystallizes it. But that gets back to what Judge Bryson was asking. 256 is a special statute. It's always been understood to require collaboration, and you're pushing the envelope. In fact, there was a case in this court I think within the last month that re-emphasized that. You're pushing the envelope and saying, well, you could have collaboration even if the people never collaborated, if somebody gets something confidential that they're not supposed to have. But that gets back to the wrong black piece. Otherwise, I'm reading the New York Times or I'm reading a scientific article or I'm walking down the street and somebody holds up a placard, and if that helps me solve the problem, then they're a co-inventor. There has to be something that gets you into the special coverage of 256. And as I understood it from your brief, that is the wrongful purloining of the material. Correct. And there has to be a competent evidence that raises a tribal issue of fact that that occurred and that that approximately led to the patent application. And that is correct. And in fact, there's a collection of evidence that indicates, to Judge Newman's question before that I didn't get to answer, that in fact, despite the fact that they said they had the mutations, there's a pile of evidence that clearly indicates that they told the public and their funding sponsor that they hadn't found the mutations. So which is it? And the only way to find out which it is is to assess that in a trial, not at summary judgment, where it's clear the information was admittedly received, it was acknowledged, there was a plethora of evidence that they put forth indicating that they had identified hundreds of SNPs, single nucleotide polymorphisms, two of which were the ones in question, but hadn't recognized it. They walked right past it. They walked right past it. And you stop walking right past it when you receive our abstract. And you recognize that, in fact, these are the ones that caused the disease. These are the ones that have been sought after for so long. So in response to Judge Fogelman, though, you seem to have taken a position, and I don't want to put words in your mouth, but that it had to be a wrongful acquisition. Well, in this case, on these facts, that's our position. We have to decide the rule to apply, and so I'm looking to you for what the right rule is. Is the rule that in the event of a wrongful acquisition, an inventorship action can be instituted, but not unless there is wrongful action? If there's wrongful action in this case, there's an inventorship action that we're entitled to. If the transfer of the information was above board, mutually agreed upon, exchange of information, however that occurred, we would say you're also entitled to it. It just seems preposterous not to be able to have a situation where, in a normal sense— I mean, if all it takes is you've got information from somebody else that has helped you think about it, doesn't everybody come under 256? Well, no. I think the reason you'd bring an interference is if there was absolutely no connection whatsoever to completely independent parties, no transfer of information, be it above board or below board. But it seems to me what your rule is leading to is a rather dramatic expansion of 256. None of the 256 cases talk about an innocence of awareness of somebody else's ideas. That's not our intent. Our intent is in the context of this factual scenario, which we believe is unique, which we believe is potentially a case of first impression under 256, under this particular scenario. And I would like to reserve a couple of—my last remaining time for rebuttal, if I could. Okay, we'll save your rebuttal time, but I really do want to ask you, it does make one wonder why, when there is a clearly established procedure for a challenging priority of the discovery, instead to move into an area devoid of precedent, on its face, difficult to reconcile with the statute and argue this position as you said you're not attempting to establish priority of invention. You're attempting to establish wrongdoing, not by these defendants, but by some intermediary, of which they were the beneficiary. Your Honor, to address that briefly, in the context of interference, we would certainly have considered that were it not for what occurred here. And in a situation where you'd normally have an interference, it would be a situation where we could avail ourselves if we were just completely ignorant of their position, they ignorant of ours, because the Patent Office recognized there were conflicting claims. That would have been the route were it not for the fact that this illicit transfer occurred. Then let me ask you another hypothetical. Let's say that you went forward with the evidence and it made clear that they had the mutation and knew this information before they wrongfully saw your abstract. Is that the end, as far as your position? At trial, if that's the determination and a finding of fact establishes that, yes. Okay, thank you. Let's save you some time. Thank you very much. May it please the Court. Appellants misunderstand Section 256 of the statute. They're wrong in trying to use it when they didn't work jointly with the MGH scientists. They're wrong in demanding a jury trial, because as this Court ruled in 2007, in Shum v. Intel, 499F3R1272, there is no right to a jury trial when only Section 256 counts that issue. And here, the District Court dismissed the 102F count, which appellants didn't appeal. What we have here is what amounts to an interference action. Appellants should be before the Patent Office under Section 135 of the statute, not before this Court under Section 256. The purpose of Section 256 is, as its title states, to correct inventorship on an issued patent. It's used when a group of people working together obtain a patent and, through honest mistake, the inventors are misnamed. Section 256 allows correction to preserve the patent's validity. The legislative history of Section 256, which we outline in our brief at page 26, and the case law make clear that Section 256 is applicable when the named inventors and the unnamed inventors were working together. This includes, for example, being on the same research team, having joint meetings, co-authoring papers, or performing scientific tests for one another. Even a vendor-vendee relationship, as in the Virginia Electric case, can show working together. The joint behavior can be direct or, as in the memory case, indirect. It does not need to rise to the level of joint inventorship. So is your theory that there's no remedy? Whether on this theory, or we've seen theories of constructive trust, or other remedies for wrongdoing? No. There is a remedy here, and that would be interference, Your Honor. Perhaps there would be a constructive trust type of claim that has not been raised in this matter. Interference does not involve wrongful acquisition of information one from the other? That's true, but what the plaintiffs, excuse me, the appellants here are claiming is they were first to conceive the invention. In their complaint, at page A6010 of the joint appendix, they claim that they were first to conceive. They claim no alleged collaboration with the MGH scientists. They've also filed a series of patent applications over the years, one of which is still pending, and none of which name the MGH scientists as co-inventors. And as this court noted in Eli Lilly, that suggests a presumption of independence. So suppose that the offended party, for lack of a better term, in a case in which there's been a misappropriation of information, doesn't have a complete conception of the invention, would not be in a position to go to the patent office, but has an important ingredient of the entire invention very much worked out, and that's the information that finds its way to the other party illicitly. Now, presumably the offended party would not in that situation be able to bring an interference because they didn't have a patentable invention. But they had a significant contribution to a patentable invention which was appropriated illicitly by hypothesis by the party that perceived it. What's the remedy in that situation? Well, the remedy in that situation would be some type of, perhaps, a derivation proceeding. A claim under 102F, perhaps. 102F to obtain the rights under the patent, or simply to invalidate the patent? Well, 102F is a patent defense for a basis of invalidity of the patent. But that wouldn't do the offended party any good in terms of getting the benefits of a patent, right? Well, if the offended party eventually filed his own patent application... Okay, well... Could the district court dismiss the count under 102F, I assume, at your initiative? Yes, that is correct. Is that right? Could you tell us if that is a viable alternative? Not here, Your Honor. No, not under these facts. There was no basis to bring a 102F action under the facts of this case. This was not an infringement action where 102F is usually implicated. This is not an issue where there was a threat of litigation where a declaratory judgment action under 102F was found. It seems to me that's really their case, that it wasn't invented by your client. They were working on it, but only when they saw what these scientists did did they have an invention. And the appropriate avenue for them is an interference action given that they have their own pending patent application and given multiple recommendations from the patent examiner to proceed with an interference action. Interference is between independent inventions. The argument here is that it was not independent because of wrongdoing by the journal editor. It was not a fully independent result by the NGH scientists. That's what the appellants allege in this instance, right. But as the unrebutted evidence shows, that transmission of the abstract, which occurred on December 22, 2000, occurred months after the NGH scientists had conceived, reduced to practice, and had proof of use of the invention. All of that evidence was... Did your opponents dispute that? Did they have to dispute a matter of fact that should be exposed at trial and not decided on summary judgment? Their basis for disputing it is not based on any evidence of their own. Their basis is to disagree with the evidence that NGH put forth. But some of the evidence is that the scientists themselves disclaimed having made that much progress. Now, you have an explanation for that, but that's evidence, right? They had not, in fact, proceeded to that point. In this instance, Your Honor, the NGH scientists did not pronounce their discoveries in any public statements at the time they made those discoveries. No, they made a contrary statement. Exactly. We haven't gotten... Exactly. Normally, if this were a criminal case, that would be enough to convict you. In those statements, in the context of IP protection, Your Honor, we submit are not out of the ordinary. Not out of the ordinary, but it is some evidence, don't you think? It is evidence that is completely rebutted by the further evidence NGH put before the district court, which appellants did not rebut, which is evidence from four disinterested individuals showing conception, reduction to practice, and proof of use months before that abstract was transmitted, unsolicited, by a third party to NGH. But the standard of proof is clear and convincing, correct? They, the scientists, have to show by clear and convincing evidence they are co-inventors, correct? Yes. And are you saying that they do present some evidence? It's not as if they don't present any evidence, and they're entitled to dispute the evidence that you've presented. You're saying even if you believe everything they said, that you could not ever meet the standard of clear and convincing? Yes, I think that's consistent with the court's statement in the Vanderbilt case, where the evidence essentially was criticized by the agreed party, and the evidence of the other side was criticized, and they presented no evidence of their own, other than complaining about a lack of evidence on the part of the patentee, and taking issue. They have public statements where your clients are saying we aren't there yet. They have the timing of the alleged preloading of the article draft, and allegedly the doctors at NGH see that. Three months later, they have it all done. Actually, sooner than that. So you're saying that, and the chain of inferences that can be drawn from that, no reasonable prior of fact could find that to be clear and convincing evidence? Yes. And why? Because, as we said, the public statements, or the lack of public statements, about having the invention is completely reasonable and acceptable. Neutral fact, in other words, is what you're saying. I guess that might be the right term, yes. But, again, this very much parallels the situation in Vanderbilt, where all appellants are doing here is claiming that they disagree with NGH's evidence. They haven't rebutted it with evidence of their own. They simply disagree with it or criticize it, or they claim that there's no other evidence that NGH puts forth. And as the court indicated in Vanderbilt, speculating about a particular scenario of events, in this case speculating on what happened based on a timeline of events, what happened before December 22nd, on December 22nd, 2000, and after, that doesn't rise to the level of clear and convincing evidence. This is summary judgment. Yes. So you would have to say that there's no way, on their view of the disputed facts, that the case could be proven by clear and convincing evidence. And all of the things that we're talking about, it seems to me, are disputed, unclear, didn't have an opportunity, all of them, to be raised. I gather there was some discovery, some depositions. But it still was decided on summary judgment. On their version of the facts, that is that the NGH scientists did not know the mutations. And nonetheless, because if it's just that they were spurred into filing their patent application, you can't do very much science, I think, in two weeks. So that perhaps there's an inference that they were on that track. Perhaps they were close to it and were given the final answer. These were disputed facts, weren't they? Which can't be resolved adversely in petitioning. I think the key facts to look at are the facts, the evidence, that appellants did not dispute that were before the district court. Arguably, after 19 depositions and tens of thousands of pages of documents exchanged over a couple of years, appellants put their best evidence on the table at summary judgment. And what they did not do is rebut the evidence from four disinterested parties of the prior conception. It sounds like what you're saying, and this was my take from the record as well, that the district court, and being a district judge, this is something I've done a few times, you look at the entire totality of what's presented on summary judgment and you say no reasonable trier of fact could find in favor of the non-moving parties. Is that what happened here? Well, I think the district court probably stopped short of that because they recognized early on that section 256 doesn't apply here. By appellants' own admission and their statements in the complaint, they did not act jointly with the MGHI. Well, no, they didn't, and nobody's contending otherwise. They're saying, and this goes back to the point Judge Newman made, it's kind of a constructive joint action. In other words, because of the wrongful taking of the intellectual property, you have the situation that you would have had had there been a voluntary collaboration. I think that's the gloss they're trying to put on 256, and that's a legal decision we have to make. But, I mean, that's what they're arguing. I would agree, and I would also agree, as Judge Newman noted, that where the appellants are going down a path that is devoid of precedent in terms of having some sort of illicit activity allegation exception to apply 256, particularly in the fact that there is, as Judge Newman noted, the interference procedure where appellants have appendices. As Judge Bryson noted, that doesn't get you there if you don't have the invention. You've just contributed to somebody else's invention. Had this been done above board involuntarily, you would have been co-inventors. So what remedy do you have if you don't qualify for an interference and you don't qualify under a narrow reading of 256? Well, would not—the issue, I think, is that there would be a qualification for an interference because if the offended party didn't have the invention, as you said, there would have been another patent application in the pipeline at some point in time, and then it would come down to two competing patent applications before the board. I'm sorry I didn't mean to monopolize, but I don't see why that's necessarily true. I might know a lot about mutation. I may not know enough to ever apply for a patent in this particular subject matter. But nonetheless, if they take advantage of my mutation information to patent something, don't I have a right to some stake in it? Well, to be—it presents an uncomfortable view of the fact in that there is something wrongful occurring here and there should be a remedy. Perhaps there's a state law—conversion. Isn't that something we're wrong— Yeah, that's my first note when I was reading the briefs in this case is conversion. There's something wrong here. Assuming that the defendants were innocent, prestigious, something went wrong. I guess I don't know what happened to that journal editor. I always thought editors of scientific journals were under very strict kind of security, ethical obligations that this perhaps inappropriately, this fellow has been turned into the wrongdoer. That doesn't seem to be—no one has really, I think, accused the MGH people of anything other than being spurred into action into the patent office. They obviously move very fast when they received, wrongfully received, this information. Now, if there was wrongdoing somewheres, there may very well be a remedy somewheres. Whether the remedy is as a matter of joint invention is—I don't want to say it's a difficult question because in some ways one might always say it was easy. It was easy. This district judge thought that whatever it is, whatever the remedy is, this isn't it. But to dismiss if in fact there's a cause of action here is a different question. Again, going back to the 102F count, which may have been more applicable, was severed apparently at the defendant's motion and dismissed on the defendant's motion. That's correct, Your Honor. And according to the magistrate judge's opinion, which the district court adopted, the appellants have waived their right to appeal it according to First Circuit law and they have not raised it here on appeal as well. I see I'm over my time, but if I may just take a minute to conclude. I think what this comes down to is having an interference action where we have a pending patent application and issue patents is being dressed up as a 256 inventorship dispute. And simply put, the appellant should be before the patent office under a well-recognized and established procedure of interference under Section 135 and they should exhaust that administrative remedy first. If there's a remedy here, they're entitled to seek it. Whether there's a remedy here is, I think, a separate question. Exactly, but... Interferences take years, cost millions, all the rest of it.  Because 256, as it's been used in all of the case law that's been cited, has always involved some degree of joint behavior, which clearly hasn't occurred here. And there has been no evidence that appellants present that the MGH scientists actually use the information in what they receive. There's speculation, but there is no evidence of it. Okay, then we have that argument. So, in our view, appellants are in the wrong forum, under the wrong statute, at the wrong time. Thank you. Mr. Bernstein? Thank you, Your Honor. I'll be very brief. This is not a priority contest. It may have been a priority contest were it not for the fact of the transfer of the information. Then, all bets were off. Once that fact became a reality, it's no longer a priority contest. It's no longer an interference in the context of the discovery that we found. As you pointed out correctly, the costs involved in interference went into the calculus. The time involved in interference, were we to choose that route, went into the calculus. But importantly, hypothetically, not everyone's going to have a patent application in this scenario. If we didn't have a patent application, then we have nowhere to go, apparently, if 256 is not the vehicle. Is it correct that all of your evidence that they actually used, the defendants actually used, the material your clients discovered, it's all circumstantial? There is no direct evidence of any kind that they actually used the information? No, it's circumstantial, Your Honor, which is permissible under the law. There's nothing wrong with circumstantial evidence, but there is no direct evidence. It's all circumstantial evidence. It's all circumstantial evidence, and we believe, on a summary judgment, all of the information that was presented, the evidence of the non-movement of our side, was to have been believed and justifiable inferences were to be drawn in our favor. And it has to be clear and convincing. It clearly could be. And it never got there because I think, and the word that has yet to be spoken, unfortunately, and I'm sure the court recognizes what I'm talking about here, is effectively the court at the last minute said, no standing. You just don't have standing. I don't want to hear this. But in fact, that's not the reality. The reality is there was compelling information that pointed in a direction clearly at that time frame that indicated that they did not have the recognition of the invention. And it was until they saw this piece of evidence, and I know I'm beating a dead horse, but until they saw this piece of evidence, they were not in possession of the invention. But we don't know that, right? We won't know that until there's a trial on the issue, that the testimony that's been taken and the witnesses appear on the stand and everybody's credibility is assessed and the evidence is fully assessed. But on summary judgment, it's the proper standard for the district court to say, all right, let's look at everything that's in the record and say if all that's true, does it satisfy the elements of the claim? Respectfully, Your Honor, it seems to us there was one dispositive piece of evidence that was brought out in our brief that was credited. It's not clear that we have a chart in our summary judgment brief that shows all the disputed issues of fact. There was really no mention of them at all. But now, I mean, what are we doing de novo? I mean, we can look and see, and if the district court went the way it did on a standing issue, we can say you've got insufficient evidence. I mean, that's within the power of this court. So it does matter whether your evidence is enough. I mean, the summary judgment motion properly put that in issue. Yes, Your Honor. Yes, Your Honor. Do you agree with your opposing counsel that if this were to go to trial, it would be not triable to a jury but only to a judge? I believe the evidence is triable to a jury. I don't agree with my opposing counsel. He cited a Federal Circuit case, Shum case, which I have a vague recollection of, but I have to confess that I don't recall. You don't happen to know the answer. I don't have the case in front of me, Your Honor. That's fine. To the statements that were made that were viewed by my opposing counsel as neutral about the fact that there was no recognition of the discovery, why make any statements at all? Why make any statements at all? And I'll close with that, Your Honor. If there are any further questions, I'll welcome them. Thank you. Thank you. Okay. Thank you. Thank you, Mr. Bernstein and Mr. Gaffney. This is the second of your submissions.